# IN THE SUPREME COURT OF TENNESSEE
## AT KNOXVILLE
October 4, 2018 Session Heard at Nashville

## WASHINGTON COUNTY SCHOOL SYSTEM, ET AL.
### v.
## THE CITY OF JOHNSON CITY, TENNESSEE

**Appeal by Permission from the Court of Appeals**
**Chancery Court for Washington County**
**No. 42491     E. G. Moody, Chancellor**

_____

### No. E2016-02583-SC-R11-CV

_____

This is one of five cases on appeal to this Court regarding the proper distribution of liquor-by-the-drink tax proceeds between a county and a municipality within the county. In each case, the county had not approved the liquor-by-the-drink sales, but the city had approved such sales. The Commissioner of the Tennessee Department of Revenue, who collects taxes on all liquor-by-the-drink sales, distributed tax proceeds to the defendant cities in accordance with the liquor-by-the-drink tax distribution statute, Tennessee Code Annotated section 57-4-306. The statute required the recipient cities to then distribute half of their proceeds "in the same manner as the county property tax for schools is expended and distributed." Tenn. Code. Ann. § 57-4-306(a)(2)(A) (2013). In each case, the recipient city distributed half of its tax proceeds to its own city school system and did not share the proceeds with the county. The counties sued the cities, claiming that the statute required the cities to distribute the tax proceeds as the counties distribute the county property tax for schools, which is pro rata among all schools in the county based on average daily attendance. In the instant case, the trial court held in favor of the county, concluding that the distribution statute was ambiguous and that public policy considerations favored the county's interpretation. Upon interlocutory appeal, the Court of Appeals reversed. After considering the statutory language, the statutory framework, and the legislative history, it adopted the interpretation of the statute advocated by the city. We agree with the Court of Appeals and hold in favor of the city.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the
Court of Appeals Affirmed; Judgment of the Trial Court Reversed**

HOLLY KIRBY, J., delivered the opinion of the Court, in which JEFFREY S. BIVINS, C.J., and CORNELIA A. CLARK, SHARON G. LEE, and ROGER A. PAGE, JJ., joined.

James Logan, Jr., Cleveland, Tennessee, for the appellants, Washington County School System, by and through the Washington County Board of Education, and Washington County.

K. Erickson Herrin, Johnson City, Tennessee, for the appellee, City of Johnson City, Tennessee.

# OPINION[1]

The issues in this case are better understood with some knowledge of the development of the pertinent liquor-by-the-drink statutes. Consequently, we offer some background on the history of the statutes before we outline the facts and analyze the issues.

## The Liquor-By-The-Drink Act

During the years of federal prohibition (1920–1933), Tennessee had "bone dry" laws, which criminalized the sale, purchase, receipt, possession, transport, and manufacture of alcoholic beverages. *City of Chattanooga v. Tenn. Alcoholic Beverage Comm'n*, 525 S.W.2d 470, 472 (Tenn. 1975); Tenn. Op. Att'y Gen. 79-215 (May 3, 1979). After prohibition ended, Tennessee enacted a "local option" law authorizing counties to hold county-wide local option elections on whether to allow off-premises (package) sales of alcoholic beverages within their borders. *City of Chattanooga*, 525 S.W.2d at 472; *Chadrick v. State*, 137 S.W.2d 284, 285 (Tenn. 1940); *see also Templeton v. Metro. Gov't of Nashville & Davidson Cnty.*, 650 S.W.2d 743, 754 (Tenn. Ct. App. 1983). "The 'bone dry law' continued in effect in counties not electing to come under the provisions of the local option law." *City of Chattanooga*, 525 S.W.2d at 472; *see also Renfro v. State*, 144 S.W.2d 793, 794 (Tenn. 1940).

---

[1] This appeal was consolidated with four other cases for oral argument only, as we will discuss in more detail below.

In 1967, the Legislature passed comprehensive legislation related to liquor sales for on-premises consumption, i.e., liquor by the drink (hereinafter "LBD"). We refer to this as "the LBD Act." The LBD Act "authorize[s] the sale of intoxicating liquors by the drink for consumption on the premises, impose[s] taxes upon such sales[,] and provide[s] for the collection thereof." *Aetna Cas. & Sur. Co. v. Woods*, 565 S.W.2d 861, 865 (Tenn. 1978). Initially, the LBD Act allowed only the largest counties to hold local option elections. *See* Tenn. Code Ann. § 57-164 (1968). Gradually, in increments, the Act was amended to allow all counties—as well as all municipalities—to approve LBD sales by local option election. *See* 1987 Tenn. Pub. Acts, ch. 456 § 2; 1992 Tenn. Pub. Acts, ch. 711 § 1.

In any jurisdiction that approves LBD sales, such sales can lawfully be made by the establishments enumerated in the statutes, including restaurants, hotels, and sports facilities. *See* Tenn. Code Ann. § 57-4-101 (2013). Private clubs are among the enumerated establishments, but they are also permitted to sell LBD even in counties or municipalities that have not adopted LBD.[2]

Tennessee Code Annotated section 57-4-301(c) levies a 15% tax on all LBD sales.[3] Tenn. Code Ann. § 57-4-301(c) (2013). We refer to this as "the LBD tax." Retailers collect the LBD tax from consumers and then forward the tax proceeds to the Commissioner of the Tennessee Department of Revenue ("Commissioner"). *See* Tenn.

---

[2] This has been the case since at least 1972. Tennessee Code Annotated section 57-4-101(a)(2) authorizes private club sales "subject to the further provisions of [Chapter 4] *other than § 57-4-103*" (which makes Chapter 4 applicable to jurisdictions that have voted for LBD sales by referendum). Tenn. Code Ann. § 57-4-101(a)(2) (2013) (emphasis added). The italicized proviso has been interpreted to allow clubs to "legally sell alcoholic beverages by the drink throughout the state, whether or not the area in which such facilities are located are 'wet' or 'dry' for other purposes." Tenn. Op. Att'y Gen. 79-215 (May 3, 1979). The parties in this case do not dispute that private clubs may sell LBD regardless of whether the jurisdiction in which they are located has approved such sales.

[3] That subsection provides:

> (c) In addition to the privilege taxes levied in subdivision (b)(1), there is further levied a tax equal to the rate of fifteen percent (15%) of the sales price of all alcoholic beverages sold for consumption on the premises, the tax to be computed on the gross sales of alcoholic beverages for consumption on the premises for the purpose of remitting the tax due the state, and to include each and every retail thereof.

Tenn. Code Ann. § 57-4-301(c) (2013 & 2018).

Code Ann. § 57-4-302 (2013 & 2018). The Commissioner then distributes the LBD tax proceeds in accordance with the statute at issue in this case, Tennessee Code Annotated section 57-4-306. We refer to this as "the distribution statute."

This case involves the application of the distribution statute as it existed prior to the enactment of a July 2014 amendment.[4] The relevant versions of the distribution statute required the Commissioner to distribute 50% of all LBD tax proceeds to Tennessee's "general fund to be earmarked for education purposes." Tenn. Code Ann. § 57-4-306(a)(1). The Commissioner was directed to distribute the remaining 50% of the tax proceeds back "to the local political subdivision" that generated the proceeds. *Id.* § 57-4-306(a)(2).

Important to this appeal, the remaining provisions of the distribution statute described what was to be done with the tax proceeds sent back to the originating local political subdivision. The distribution statute said that half of those proceeds would go to the general fund of the county, city, or town in which the taxes were generated. *Id.* § 57-4-306(a)(2)(B). The other half, the distribution statute stated, "shall be expended and distributed in the same manner as the county property tax for schools is expended and distributed." *Id.* § 57-4-306(a)(2)(A). Interpretation of this provision is the issue presented to us in this case.

### Washington County

The underlying facts in this case are essentially undisputed. Johnson City ("the City") lies in Washington County ("the County").[5] The City has at all relevant times had its own municipal school system separate from the Washington County school system.

In 1980, citizens of the City passed a referendum authorizing LBD sales within City limits. After that, the City received LBD tax proceeds from those sales. The City

---

[4] The distribution statute was amended substantially effective July 1, 2014, after the five lawsuits herein were filed. *See* 2014 Tenn. Pub. Acts, ch. 901 § 1 (H.B. 1403). Unless otherwise specified, references to the distribution statute are to the version in the 2013 volume of the Tennessee Code Annotated, which sets forth the statute as it existed at the time these lawsuits were filed and before the July 2014 amendment.

[5] Johnson City is also partly located in Carter and Sullivan Counties, but those counties are not parties to this appeal.

has never shared those tax proceeds with the County or with any school system in the County.

The County has not passed a referendum on LBD sales. It has, however, received LBD tax proceeds from lawful LBD sales in private clubs located in unincorporated areas of the County. Unlike the City, the County distributed half of its private club LBD tax proceeds among all of the school systems in the County—just as it distributes County property taxes for schools—pro rata in accordance with average daily attendance maintained by each. *See* Tenn. Code Ann. § 49-3-315(a) (2018).

On May 2, 2014, the Washington County School System, by and through the Washington County Board of Education ("the County Board"), filed a lawsuit against the City seeking a declaratory judgment as to the rights and obligations of the parties concerning LBD tax proceeds. The County Board alleged that the City was required to share its LBD tax proceeds with the County just "as the county property tax for schools is expended and distributed" by the County. The County Board sought a declaratory judgment and damages in the "full amount of unremitted tax revenues together with prejudgment interest."

In June 2014, the City filed a motion to dismiss or for summary judgment, arguing that the County Board lacked capacity to sue. It also claimed that the LBD tax distribution provisions did not apply to the County because the County had never authorized LBD sales by referendum and that the language of the distribution statute did not require the City to share its LBD tax proceeds.

Subsequently, the County filed a motion to intervene, which was granted. As a result, we hereinafter refer to the County Board and Washington County collectively as "the County."

The parties filed cross-motions for summary judgment. In October 2016, the trial court entered an order granting summary judgment in favor of the County and denying the City's motion for summary judgment. In doing so, the trial court found that the distribution statute and the legislative history surrounding the July 2014 amendment were both ambiguous. Because of these ambiguities, the trial court considered "public policy and the principles of equity and fairness," which led it to conclude that students in City and County schools should receive equal treatment under the LBD Act. On this basis, the trial court held that half of the City's LBD tax proceeds must be equitably distributed between the City and County school systems; it directed the City to pay the County

accordingly.[6]  The City filed an application for interlocutory appeal,[7] which was granted by both the trial court and the Court of Appeals.

Around the same time, three other cases involving the same issue regarding the distribution statute were appealed to the Court of Appeals for the Eastern Section.  *See Blount Cnty. Bd. of Educ. v. City of Maryville*, No. E2017-00047-COA-R3-CV, 2017 WL 6606855 (Tenn. Ct. App. May 26, 2017) ("*Blount Cnty.*"); *Bradley Cnty. Sch. Sys. ex rel. Bradley Cnty. Bd. of Educ. v. City of Cleveland*, No. E2016-01030-COA-R3-CV, 2017 WL 6598557 (Tenn. Ct. App. Dec. 27, 2017) ("*Bradley Cnty.*"); *Sullivan Cnty. v. City of Bristol*, No. E2016-02109-COA-R3-CV, 2017 WL 6598559 (Tenn. Ct. App. Dec. 27, 2017).  A motion to consolidate was filed, and the Court of Appeals for the Eastern Section entered an order "granting the motion 'only to the extent that these cases shall be set for oral argument on the same docket and on the same day.'"  *Washington Cnty. Sch. Sys. ex rel. Washington Cnty. Bd. of Educ. v. City of Johnson City*, No. E2016-02583-COA-R9-CV, 2017 WL 6603656, at *3 (Tenn. Ct. App. Dec. 27, 2017) ("*Washington Cnty.*") (quoting order).  Pursuant to the order, the intermediate appellate court held arguments in this case and in the three other cases on the same day before the same panel of judges.

On December 27, 2017, the Eastern Section panel of the Court of Appeals contemporaneously issued separate decisions in all four cases, including this one, holding in favor of the city defendants.[8]  *See Washington Cnty.*, 2017 WL 6603656, at *17; *see also Blount Cnty.*, 2017 WL 6606855, at *21; *Bradley Cnty.*, 2017 WL 6598557, at *17; *Sullivan Cnty.*, 2017 WL 6598559, at *17.  The appellate court first determined that the distribution statute was ambiguous regarding whether cities that operate their own school systems were required to remit a portion of their LBD tax proceeds to their counties when the counties had not approved LBD sales by referendum.  *See Washington Cnty.*, 2017 WL 6603656, at *10; *see also Blount Cnty.*, 2017 WL 6606855, at *9; *Bradley Cnty.*, 2017 WL 6598557, at *8; *Sullivan Cnty.*, 2017 WL 6598559, at *8.  After considering the statutory framework, legislative history, and other sources, the Court of Appeals held that the distribution statute directed the cities to expend and distribute half of their LBD tax proceeds in the manner in which the county property taxes would be expended and

---

[6] The trial court ordered the parties to conduct an evidentiary hearing on damages.

[7] The City's application for interlocutory appeal was not opposed by the County.

[8] The decisions were all issued by the same appellate panel, and the legal analysis is substantively identical in each opinion.

- 6 -

distributed *within the cities*, that is, for the benefit of the cities' own school systems. *See Washington Cnty.*, 2017 WL 6603656, at \*17; *see also Blount Cnty.*, 2017 WL 6606855, at \*21; *Bradley Cnty.*, 2017 WL 6598557, at \*17; *Sullivan Cnty.*, 2017 WL 6598559, at \*17.

About a month later, on January 23, 2018, the Court of Appeals for the Middle Section reached the opposite conclusion in a factually similar case. *Coffee Cnty. Bd. of Educ. v. City of Tullahoma*, No. M2017-00935-COA-R3-CV, 2018 WL 522423, at \*4 (Tenn. Ct. App. Jan. 23, 2018). In *Coffee County*, the Middle Section panel acknowledged the four decisions issued by the Eastern Section panel but disagreed with the analysis in those decisions. *Id.* at \*3-4 (noting that it did "not disagree with [its] learned cohorts lightly"). Rather, the Middle Section panel deemed the distribution statute unambiguous and held that, on its face, the statute plainly required municipalities to distribute the tax proceeds in the same manner that the counties distribute county property taxes for schools. The Middle Section declined to consider anything outside the text of the specific provision. *Id.* at \*3.

We granted permission to appeal in this case and in the four similar cases arising out of both the Eastern and Middle Sections of the Court of Appeals to resolve the split among the appellate courts on the proper interpretation of the distribution statute.[9]

## STANDARD OF REVIEW

We review a trial court's ruling on a motion for summary judgment de novo without a presumption of correctness in the lower court's decision. *Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 250 (Tenn. 2015) (citing *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997)). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04; *Rye*, 477 S.W.3d at 250.

As we have indicated, the relevant facts in the instant appeal are undisputed, and the issues involve only the interpretation of statutes. Issues of statutory interpretation are questions of law, which are also reviewed de novo without a presumption of correctness. *Beard v. Branson*, 528 S.W.3d 487, 494-95 (Tenn. 2017) (quoting *Kiser v. Wolfe*, 353

---

[9] This case was consolidated with the other four cases for oral argument only. This opinion resolves only the dispute between Washington County and Johnson City. Separate opinions are being issued in each of the other four cases.

S.W.3d 741, 745 (Tenn. 2011)); *Circle C Constr., LLC v. Nilsen*, 484 S.W.3d 914, 917 (Tenn. 2016).

## ANALYSIS

The issue on appeal involves interpretation of the distribution statute as it existed when this lawsuit was filed in May 2014.[10] At that time, the statute read:

(a) All gross receipt taxes collected under § 57-4-301(c) shall be distributed by the commissioner as follows:

(1) Fifty percent (50%) to the general fund to be earmarked for education purposes; and

*(2) Fifty percent (50%) to the local political subdivision as follows:*

*(A) One half (1/2) of the proceeds shall be expended and distributed in the same manner as the county property tax for schools is expended and distributed*; provided, however, that except in [Bedford County][11] any proceeds expended and distributed to municipalities which do not operate their own school systems separate from the county are required to remit one half (½) of their proceeds of the gross receipts liquor-by-the-drink tax to the county school fund; and

(B) The other one half (1/2) shall be distributed as follows:

---

[10] As noted above in footnote 4, the distribution statute was amended substantially in July 2014, after this lawsuit was filed. *See* 2014 Tenn. Pub. Acts, ch. 901 § 1 (H.B. 1403). As explained in *Coffee County*, however, we need not delve into the particulars of the amendment because it does not apply in this case and it does not inform our interpretation of the pre-July 2014 versions of the statute. *See Coffee Cnty. Bd. of Educ. v. City of Tullahoma*, No. M2017-00935-SC-R11-CV, slip op. at 22 (Tenn. May 8, 2019).

[11] It is undisputed that the statutory language omitted and replaced by the bracketed language describes the population parameters of Bedford County.

> (i) Collections of gross receipts collected in unincorporated areas, to the county general fund; and
>
> (ii)    Collections of gross receipts in incorporated cities and towns, to the city or town wherein such tax is collected.

Tenn. Code Ann. § 57-4-306(a)(1)–(2) (2013) (emphasis added).  The italicized portion of the statute, which we call "the local education provision," is the specific provision in dispute in this case.  The question is whether municipalities with their own school systems were required to expend and distribute their LBD tax proceeds with other schools in the county pro rata, that is, "in the same manner as the county property tax for schools is expended and distributed" by the county.  *Id.* § 57-4-306(a)(2)(A) (2013).

We examined the proper interpretation of the distribution statute at length in *Coffee County*, the case arising out of the Middle Section Court of Appeals and released on the same date as this opinion.  *See Coffee Cnty. Bd. of Educ. v. City of Tullahoma*, No. M2017-00935-SC-R11-CV, slip op. at 22 (Tenn. May 8, 2019) (hereinafter "*Coffee Cnty.*").  After fulsome analysis, we concluded in *Coffee County* that the local education provision in the distribution statute "required a municipality with its own school system to expend and distribute half of its LBD tax proceeds in the same manner that the county property tax for schools is expended and distributed within the municipality, which is for the benefit of the municipality's own school system."  *Id.* at 22.  In that case, because the City of Tullahoma had its own school system, we held that the city "was not required to share its LBD tax proceeds with the [c]ounty" during the relevant time period.  *Id.* at 22.

The issue in the instant case is substantively indistinguishable from the issue decided in *Coffee County*.  The trial court in the instant case held in favor of the County based on "public policy and principles of equity and fairness."  In *Coffee County*, however, we recognized that any "argument concerning perceived fairness of the tax distribution scheme provided by the statute would properly be directed to the General Assembly rather than to this Court."  *Coffee Cnty.*, slip op. at 22-23 n.29 (quoting *Blount Cnty.*, 2017 WL 6606855, at \*18; *Bradley Cnty.*, 2017 WL 6598557, at \*16; *Sullivan Cnty.*, 2017 WL 6598559, at \*17; *Washington Cnty.*, 2017 WL 6603656, at \*17).  Based on our analysis in *Coffee County*, we hold that the distribution statute did not require the City to share half of its LBD tax proceeds with the County and other school systems in the County pro rata.  Rather, the local education provision directed the City to expend and distribute the education portion of its LBD tax proceeds in support of its own

municipal school system.  For this reason, we reverse the trial court and affirm the Court of Appeals decision in favor of the City.

## CONCLUSION

The decision of the trial court is reversed and the decision of the Court of Appeals is affirmed.  Costs on appeal are to be taxed to the Appellants Washington County School System, by and through the Washington County Board of Education, and Washington County, as well as their surety, for which execution may issue, if necessary.

 

 

_____
HOLLY KIRBY, JUSTICE